Filed 11/10/20  P. v. Beverson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>PHILIP WAYNE BEVERSON,<br><br>      Defendant and Appellant. | D075628<br><br><br>(Super. Ct. No. SCN370126) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

In 2018, a jury convicted Philip Wayne Beverson on twelve counts of lewd act on a child under 14 (Pen. Code, § 288, subd. (a), counts 1-3 as to P., counts 4-12 as to M.) and eight counts of lewd act on a child 14 or 15 years old

(*id.*, § 288, subd. (c)(1), counts 13-20 as to M.).[1] The trial court sentenced Beverson to a total term of 90 years to life in prison. At trial, the jury heard expert testimony regarding child sexual abuse accommodation syndrome (CSAAS). On appeal, Beverson contends the trial court had a sua sponte duty to provide a limiting instruction to the jury regarding that testimony, or alternatively, counsel was ineffective for failing to request a limiting instruction, and the failure to give such an instruction was prejudicial error. We conclude the failure to provide a limiting instruction was not prejudicial and affirm the judgment.

FACTS

A. *Victims' Initial Disclosures*

In 1998, eight-year-old P. told her uncle that Beverson, her mother's boyfriend at the time, had forced her to touch him inappropriately. When this information was relayed to P.'s mother, she immediately confronted Beverson, who denied the allegations. She and P. promptly filed a formal police complaint, but no charges were filed at that time.

Sometime around 2000 to 2002, M., who was between 9 and 12 years old at the time, told her mother that Beverson—M.'s stepfather—had touched her inappropriately, but M.'s mother brushed it off, suggesting that Beverson must have been asleep at the time. Beverson continued to sexually abuse M. for years, until she was in tenth grade (2006-2007). In 2009, detectives contacted M. after receiving a report regarding potential molestation, but M., afraid and unprepared to discuss the abuse, denied the allegations. In 2015, M. was still suffering from the effects of the abuse and felt the need to do something; she reported the abuse to the San Diego Sheriff's Department.

---

[1]    Unless otherwise indicated, statutory references are to the Penal Code.

B. *Charges*

In 2017, an information charged Beverson with three counts of lewd act upon a child, P. (§ 288, subd. (a), counts 1-3), and alleged in connection with each count that Beverson was convicted of committing the offense against more than one victim (§ 667.61, subds. (b), (c) & (e)), that the charges were committed against more than one victim (§ 1203.066, subd. (a)(7)), that Beverson had substantial sexual conduct with a child under 14 years of age in the commission of the offense (§ 1203.066, subd. (a)(8)), and that the offense was committed when the victim was under the age of 18 years and the case was commenced prior to the victim's fortieth birthday (§ 801.1, subd. (a)).[2]

The information further charged Beverson with nine counts of lewd act upon a child, M. (§ 288, subd. (a), counts 4-12), and alleged in connection with each count that Beverson was convicted of committing the offense against more than one victim (§ 667.61, subds. (b), (c) & (e)), that the charges were committed against more than one victim (§ 1203.066, subd. (a)(7)), that Beverson had substantial sexual conduct with a child under 14 years of age in the commission of the offense (§ 1203.066, subd. (a)(8)), and that the offense was committed when the victim was under the age of 18 years and the case was commenced prior to the victim's fortieth birthday (§ 801.1, subd. (a)).[3]

---

[2]    It was alleged that counts 1 through 3 occurred sometime between September 1997 and May 1998.

[3]    It was alleged that count 4 occurred sometime between September 2000 and June 2002, and that counts 5 through 12 occurred sometime between September 2003 and January 2005.

3

Finally, the information charged Beverson with eight counts of lewd act on a child 14 or 15 years of age, M. (§ 288, subd. (c)(1), counts 13-20), and alleged in connection with each count that the charges were committed against more than one victim (§ 1203.066, subd. (a)(7)) and that the offense was committed when the victim was under the age of 18 years and the case was commenced prior to the victim's fortieth birthday (§ 801.1, subd. (a)).[4]

Beverson denied all of the charges.

C. *Trial*

   1. *P's Mother*

P.'s mother testified that she and her boyfriend Beverson moved into an apartment together in 1998 when P. was 7 or 8 years old. Beverson would watch P. and her sibling when the mother was at work. P.'s mother testified the children visited her mother (their grandmother) during spring break in 1998. During the visit, P.'s grandmother called her mother and shared something P. had disclosed. P.'s mother confronted Beverson immediately; he denied the allegations and asked her to marry him. She told him she wanted nothing to do with him and to get out of the apartment. P.'s mother took her to the local police department and reported three separate instances of sexual abuse.

P.'s mother admitted she did not suspect that Beverson was molesting P. before her disclosure, but looking back, she recalled that when she was living at the apartment with Beverson, P. had started wetting the bed, which she had not previously done; P. was unusually quiet; and P. would cry for her mother not to go to work (leaving P. with Beverson). Within two months of Beverson moving out, the bedwetting stopped, and P. seemed happier. P.'s

---

4    It was alleged that counts 13 through 20 occurred sometime between January 2005 and June 2007.

4

mother testified she did not know M. or M.'s mother. She identified Beverson in the courtroom.

## 2. *P.*

P., now in her 20's, testified she was a married mother of two with a baby on the way. She testified that when she was about seven years old, her mother's boyfriend Beverson would watch her and her younger sibling when her mother was at work in the evenings. She testified that she and her sibling would usually stay and play in the bedroom, but one evening Beverson called her out to the living room. She recalled he was watching a movie with a blanket over him. He took her hand and placed it under the blanket on his erect penis, which was out of his clothing. She said he instructed her to rub up and down until he ejaculated on her hand. At the time, she did not know what was happening but thought it was strange. She testified that "as soon as it started to feel wet and sticky, he instructed [her] to go and wash [her] hands in the bathroom." He did not say anything as this was happening, but he held his hand over hers and "guid[ed] it."[5]

P. recounted another incident when Beverson called her into his bedroom (which he shared with her mother), took out his penis, and instructed her to play with it or touch it. She remembered this happening in the bedroom on at least two separate occasions. P. testified she did not tell her mother what had happened because she was afraid her mother or Beverson would be upset with each other or with her. She recalled that, when she was visiting her grandmother's house in 1998, she disclosed to her

---

[5] There was a pause in the proceedings when P., obviously emotional, attempted to recount the first incident of abuse.

uncle what had happened, and her uncle told her grandmother.[6] She never saw Beverson after that. She did not recall reporting the incident to the police. She identified Beverson in the courtroom.

### 3. *P.'s Uncle*

P.'s uncle testified he never saw anything out of the ordinary happen between Beverson and P. He recalled that, one day when P. was visiting, she suddenly began to cry. When he asked her what was wrong, she told him that Beverson "grabbed her hand and put it on his penis." Then P. said as she gestured, " 'he made me go up and down like that,' " and " 'then some white stuff came out.' " P.'s uncle then called his mother (P.'s grandmother) and told her to come home because something had happened to P. P.'s uncle identified Beverson in the courtroom.

### 4. *P.'s Grandmother*

P.'s grandmother recounted receiving a phone call from her son when P. was visiting their home. She testified that when she came home, P. was crying.[7] She asked P. what was wrong, and P. told her that Beverson "had a sheet or a blanket and he got her hand and put it on his penis. [¶] . . . [¶] He told her to start moving it—and some stuff came out." P.'s grandmother recalled that, during that visit, P. was wetting the bed every night, which she had not done previously. P. told her grandmother she did not want to go back home.

---

[6] There was another pause in the proceedings when P. recounted telling her uncle Beverson had forced her to touch him inappropriately.

[7] There were pauses in the proceedings as P.'s grandmother broke into tears recounting her conversation with P.

### 5. *Expert Testimony Regarding Child Sexual Abuse*

Christina Shultz testified she was a supervisor and forensic interviewer for Palomar Health Forensic Health Services, Child Abuse Program. Shultz testified based on her experience as a forensic interviewer for 14 years and as a licensed clinical social worker. Shultz stated she was not testifying as a fact witness, but as an expert, and acknowledged she had never previously testified as an expert. She testified she had not reviewed any of the discovery in the case, had not interviewed P. or M., and had no specific knowledge about the facts of this case. She stated she would only testify generally about child sexual abuse.

Shultz testified sexual abuse commonly occurs in the home with no one other than the victim and the abuser being aware of it. When asked whether there were physical manifestations of child sexual abuse, Shultz testified that children may have stomach aches, sleep disturbances, or appetite disturbances. When asked whether bedwetting is a symptom of child sexual abuse, Shultz testified that she was familiar with parents who observed regression "with potty training" and also stated that industry research acknowledged bedwetting could be a coping mechanism for victims of child abuse. She acknowledged bedwetting had other medical causes and indicated it "is not definitive of sexual abuse, but it could be a sign."[8]

Shultz testified victims of sexual abuse commonly have conflicting feelings toward their abuser, and when the abuser is someone with whom the child shares a family bond, the child commonly wants to continue spending time with them. Abused children commonly "disassociate or avoid feeling

---

[8]    On cross-examination, defense counsel asked if the expert had talked to P. about bedwetting, and Shultz emphasized she had not.

what they're experiencing" to be able to function in what appears to be a normal way, despite the abuse.

Shultz testified that delayed disclosure of abuse is more common than immediate disclosure, if the abuse is disclosed at all. Disclosure might be accidental, like when a child who exhibits unusual behavior is probed for explanatory information. Commonly, children may disclose small details at first, and then perhaps disclose more later, depending on what response they received when they initially disclosed. Shultz testified it is "not uncommon" for a victim to wait until adulthood to disclose. When asked why a child victim might not disclose until adulthood, Shultz testified "the number one thing we hear from adults in these retrospective studies is the loyalty to the perpetrator." She explained that, if the abuser is a parent or a stepparent, the child may not want to get the abuser into trouble or otherwise disrupt the family. Also, the child fears getting into trouble themselves, or they may feel culpable or responsible for the abuse.

Shultz testified that when young children disclose, they commonly disclose to a caregiver, whereas adolescents are more likely to disclose to a peer. When adults disclose abuse that happened to them as a child, it may be because they recognize the abuse is affecting their adult intimate relationships or because, as an adult, they more fully appreciate the wrongfulness of the acts.

Shultz testified it is not uncommon for abused children to falsely deny the abuse, even in the presence of other, corroborating evidence, and this may happen for various reasons, including embarrassment or fear they will not be supported if they admit the abuse. Shultz admitted that, in her practice, there is no way for her to know if the abuse happened or not.

8

6. *M.*

M., now in her 20's, testified she is a nursing student and is married and expecting her first child. She identified Beverson, her stepfather, in court. M. testified she was seven years old when Beverson began dating her mother and nine when they married. She testified he was like a father to her, and she called him dad.

M. testified she remembered the first instance when Beverson had touched her inappropriately. She did not recall exactly when it occurred but believed she was in fourth grade at the time—nine or ten years old.[9] She testified that she remembered she and Beverson were lying on the living room couch watching a movie. Her mother was asleep in her bedroom. Beverson began to stroke M.'s vagina over her pajama pants. M. tried to cross her legs to make him stop, but he persisted and told her it was "okay." He "kind of nudged [her] leg back open with his arm while his hand was still on [her] vagina." Then he went underneath her pajama pants, on top of her underwear, and continued to "rub[] the top of [her] vagina with his hand." M. testified she was scared and knew it was not right, but she did not know what to do.

M. did not discuss the incident with anyone at the time. However, sometime between the fourth and sixth grade (nine to twelve years old), she remembered being at her friend S.G.'s house and reading a story about a girl who had been molested. She became very upset because "it brought [her] back to the time on the couch." M. testified she told S.G. she was upset

---

9    Based on her estimated grade and age, the incident would have occurred in or around 2000 or 2001.

9

because her stepfather had touched her. She recalled talking to S.G.'s mother and S.G.'s mother suggesting she talk to her own mother about it.[10]

Sometime after that, M. did talk to her mother. She told her mother that, when they were on the couch, Beverson had put his hand on her vagina. Her mother responded that Beverson "was probably just sleeping" when that happened "because, um, he had sometimes done that to her in his sleep." M. did not bring it up with her mother again. M. testified she "was scared, and [her] mom kind of brushed it off[,] [s]o [she] didn't know what to do." She did not feel like she had her mother's support.

M. testified that at that time her relationship with her family and with Beverson was "good," and she characterized her relationship with Beverson as a positive one.

M. testified that, some time before she started eighth grade, when she was 12 or 13 years old "it started again." She testified, "it happened again and continued to happen a lot more." When asked what she meant by "it," M. said, "the rubbing of the vagina, but it went further . . . um . . . intercourse and oral." She testified that Beverson's penis went into her vagina, her mouth went on his penis, his mouth went on her vagina, and he inserted his fingers in her vagina. She said he kissed her with his tongue inside her mouth. She testified the sex acts would happen in her bedroom, at night, when her mother was sleeping.

M. described the encounters that occurred before she began eighth grade. She said Beverson would typically come into her bedroom at night, after her mother was asleep, dressed in a T-shirt and boxers, and would lie in her bed next to her and start touching her. Usually she was already asleep

---

10    When asked whether she was specific about what she told S.G. and her mother, M. responded that she "was vague."

and this would wake her up. She testified he "usually would start with, um, his fingers going into my vagina and then [it] would usually lead to sexual intercourse." She testified she "remember[ed] him being drunk—or [he] had been drinking, either because [she] saw him drinking . . . before [she] went to bed or [she] could smell it—but it wasn't every time. Sometimes he just seemed normal . . . or without the alcohol." She testified that she would "play along because [she] didn't know what else to do, and [she] was scared and didn't know how to stop it."

M. estimated that, before she got to eighth grade, she had intercourse with Beverson over 50 times. Most of the time (she estimated 90 percent of the incidents) the sexual intercourse was accompanied by digital penetration. Sometimes it was accompanied by oral copulation: She estimated that during 20 to 25 percent of the incidents he would put his mouth on her vagina, and during 20 to 25 percent of the incidents she would put her mouth on his penis. M. testified that Beverson sometimes would use physical force to make her comply, for example by pushing open her legs "similar to the incident on the couch," but she said he was not violent and did not threaten her.

M. testified the same types of sex acts continued to occur between eighth and tenth grade, with the same frequency. M. also recalled sex acts during that time frame that occurred on the couch in the living room at her home, and two instances of digital penetration that occurred at two of Beverson's job sites.[11] When she was in tenth grade, between 15 and 16 years old, it "slowly started to stop and then eventually . . . it didn't happen anymore."

---

[11]   M. testified that Beverson had his own construction business and also repaired cars.

M. acknowledged she did not disclose the abuse to her mother or anyone else when it was happening. She testified that she considered Beverson to be "like a father," and she "was scared" and feared the effect her disclosure would have on the family. Later in high school, M. told her friend C.R. about the abuse. After that, M. was contacted by a police detective who told her a report had been filed.[12] The detective asked if she was being molested by Beverson. M. testified she was scared and upset by the phone call; she felt her friend "had gone behind [her] back." She denied any sexual abuse had occurred.

M. testified that, by the time she was 21 and living outside the family home, she felt the abuse "was really starting to affect [her]" and decided to talk to her mother about it.[13] She hoped she would have her mother's "support to help [her] with . . . what [she] needed to do next or . . . to help [her] cope with what [she] had gone through, from a motherly standpoint." However, "that did not happen." She had a long conversation with her mother during which she disclosed the sexual abuse. Afterward, she received a phone call from her mother and Beverson. Her mother told her Beverson had something to tell her. Beverson got on the phone and "apologized" but "did not state specifics." He "told [her] he was sorry [for] any way that it may have affected [her]." After that, her mother wanted M. "to come over to the house and sort of be a happy family, um, as if nothing happened, as if what did happen didn't affect [her], and that [she] would be okay to go to the house and do family things." M. felt she did not have her mother's support. She lessened communication and contact with her family.

---

[12]    M. testified she received the call from the detective sometime in 2009.

[13]    M. turned 21 in 2012.

M. testified that she continued to feel the abuse "was affecting [her]" and "affecting [her] school.  [She] wasn't performing as well.  [She] felt . . . depressed and [she] felt ready to tell somebody and do something," so, in 2015, she reported the abuse to the San Diego Sheriff's Department.

M. testified she did not know P. or P.'s mother.

### 7. *S.G.*

S.G. testified she and M. had been friends since kindergarten.  She recalled an incident that occurred around the time the girls were in sixth grade when M. was at her house, read a story about a girl who had been sexually abused, and began to cry and became very upset, which caused S.G. to be concerned and confused.  S.G. remembered going to talk to her mother about it because M. was very upset.  S.G. recalled M. saying something like that had happened to her.  S.G. testified she and M. never discussed it again until approximately 2015 when M. fully disclosed the sexual abuse and told her a detective might contact her.  M. never asked her to lie or be untruthful.

### 8. *S.G.'s Mother*

S.G.'s mother testified that she knew M. well, as her daughter and M. had been close friends since kindergarten.  S.G.'s mother recalled an incident when M. had come to their house for a sleepover and, after reading a particular short story about a molested girl, became very upset.  She recalled the girls must have been in fourth, fifth, or sixth grade at the time, but she could not remember exactly when this was.  S.G.'s mother testified M.'s reaction to the story "was above and beyond what like being like a girl crying or something like that."  She said M. "was really upset and inconsolable," and that "[s]he was obviously a little bit traumatized."  She testified she felt M. "didn't want to share" the specifics of what had upset her.

13

### 9. *C.R.*

M.'s friend C.R. testified that she and M. had been close friends as children and into high school. One time during their junior or senior year of high school, M. called, very upset, and asked C.R. to pick her up. M. stayed at C.R.'s house for a few days, and at one point, C.R. asked M. if she had been abused. C.R. testified that M. broke down in tears and nodded her head. M. told her that her stepfather had sexually abused her for years, starting at a young age, and that the abuse included sexual intercourse. M. told C.R. not to tell anyone about it. C.R. later discussed it with her own therapist, not realizing that her therapist was a mandated reporter. M. later contacted C.R. M. was angry and upset because she realized C.R. had told someone about the abuse. C.R. testified this ended their friendship.

### 10. *Police Testimony*

The defense called two witnesses: retired Oceanside Police Officer James Sandifer and Detective David Brannan with the San Diego Sheriff's Department. Officer Sandifer testified he had interviewed P.'s mother in 1998, and his report reflected she had left her child with Beverson on three occasions.

Detective Brannan investigated Beverson after M. filed a report in September 2015. M. had told him her friend S.G. would not be a helpful witness because she had not told S.G. about the sexual abuse. Detective Brannan nonetheless asked M. for S.G.'s contact information and got in touch with S.G.

### 11. *Jury Instructions and Verdict*

The trial court instructed the jury with CALCRIM No. 332, Expert Witness:

> "A witness was allowed to testify as an expert and to give an opinion. You must consider the opinion, but you are not

14

required to accept it as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

"An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

The trial court also instructed the jury with CALCRIM No. 1191B, Evidence of Charged Sex Offense:

"The People presented evidence that the defendant committed the crimes of lewd act upon a child under 14 (in violation of Penal Code section 288(a)) and lewd act upon a child 14 or 15 years of age (in violation of Penal Code section 288(c)(l)), charged in Counts 1 through 20.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime.

15

The People must still prove each charge and allegation beyond a reasonable doubt."

After deliberating for less than three hours, the jury returned guilty verdicts on all counts, and found all related allegations to be true.

D. *Sentence*

The trial court sentenced Beverson to a total term of 90 years to life in prison, comprised of six consecutive 15-years-to-life sentences on counts 1, 4, 5, 7, 9, and 11. The trial court imposed concurrently running sentences on counts 2, 3, 6, 8, 10, and 12 through 20.

## DISCUSSION

Beverson contends the trial court had a sua sponte duty to provide a limiting instruction regarding the CSAAS testimony. He contends the court should have instructed the jury with CALCRIM No. 1193, which provides that "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against [him]," and that the jury "may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [the victim's] testimony."

Beverson contends the failure to instruct was prejudicial, requiring the reversal of all counts, or, at a minimum, counts 1 through 3 (involving P.).[14] If the court did not have a sua sponte duty to provide a limiting instruction, then counsel was ineffective for failing to request it.

___

[14] Beverson argues that—in the absence of the expert's testimony—the jury "easily" could have concluded the prosecution failed to meet its burden of proof beyond a reasonable doubt as to counts 1-3 because no criminal charges were filed against Beverson following the victim's initial disclosure and there was no evidence the victim or her mother pursued prosecution.

16

A. *Additional Procedural Background*

Prior to trial, Beverson moved to exclude evidence of child sexual abuse accommodation syndrome, "delayed disclosure" and related theories. The prosecution argued general testimony about child molest victims and perpetrators was relevant and admissible for purposes of restoring the credibility of the testifying victims, whose credibility would be attacked with "the following myths and misconceptions": (1) since the victims did not disclose the sexual abuse immediately, the molests did not occur, (2) since M. did not appear outwardly traumatized by the abuse, the molest did not occur, and (3) since M. denied the abuse to law enforcement officers in 2009, the molest did not occur. The prosecution informed the court the expert was not familiar with the facts of this case, would offer only general expert testimony about victims as a class, and would not use evidence to opine a molest in fact occurred. The prosecution raised the option of giving a limiting instruction to the jury. The trial court concluded the proffered witness qualified as an expert and agreed to admit the testimony, emphasizing that the expert witness would not be permitted to opine as to the veracity of the witnesses.

B. *CSAAS Evidence*

Expert testimony relating to the behavior of child abuse victims, such as delayed reporting and retraction, is often referred to as " 'child sexual abuse accommodation syndrome' " evidence or "CSAAS" evidence.[15] (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*); see *Bowker, supra,* 203 Cal.App.3d at pp. 389, 392-394.) This testimony has long been held to be

___

[15] The theory of child abuse accommodation syndrome was first articulated in 1983. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 389, fn. 3 (*Bowker*).) The syndrome has five stages—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction. (*Id.* at p. 389.)

17

admissible in California for limited purposes: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, at p. 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

Our Supreme Court has repeatedly cited with approval case law allowing the use of CSAAS and similar evidence. (*McAlpin*, *supra*, 53 Cal.3d at p. 1300 [ratifying use of similar evidence regarding the failure of the parents of abused children to report incidents of molestation]; *People v. Brown* (2004) 33 Cal.4th 892, 906-907 [analogizing CSAAS testimony to expert testimony regarding behavior of domestic violence victims, and finding the latter evidence similarly admissible]; *People v. Ward* (2005) 36 Cal.4th 186, 211 (*Ward*) [noting "[t]his court has frequently permitted the use of expert testimony to explain to lay jurors conduct that may appear counterintuitive in the absence of such insight"; concluding, "we see no reason to exclude such testimony as it relates to gang activities"].)

C. *Analysis*

Beverson and the Attorney General acknowledge there is a split of authority as to whether the trial court has a sua sponte duty to instruct with CALCRIM No. 1193 when CSAAS evidence is admitted. (Compare *People v. Housley* (1992) 6 Cal.App.4th 947, 959 (*Housley*) [holding that trial courts have a sua sponte duty to provide a limiting instruction "in all cases in which

18

an expert is called to testify regarding CSAAS"] with *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074 (*Mateo*) [disagreeing with *Housley* and holding a limiting instruction "need only be given if requested"].) Based on our record, we need not decide whether *Housley* is correctly decided. We conclude that even if the court had a sua sponte duty to instruct pursuant to CALCRIM No. 1193, the absence of an instruction was harmless error under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Mateo*, at p. 1074; *Housley*, at p. 959.)[16]

The *Mateo* court concluded no prejudice was shown by the failure to instruct, reasoning that "[w]here, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence." (*Mateo*, *supra*, 243 Cal.App.4th at p. 1074.) In *Housley*, the Court of Appeal concluded that, even if a sua sponte instruction had been provided, there was no reasonable

---

[16] Beverson contends the court's failure to provide a limiting instruction amounts to federal constitutional error because it violated his "right to a fair trial and a reliable jury verdict." He forfeited this argument by not raising it in the trial court. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-22.) It also lacks merit. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 413, fn. 34 ["contrary to defendants' apparent argument, every state law error does not automatically result in a violation of the federal Constitution"]; see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1747 ["introduction of CSAAS testimony does not by itself deny appellant due process"].) The authority he cites is not on point. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 43 [state rule disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue does not violate due process]; *Schad v. Arizona* (1991) 501 U.S. 624, 627 [first-degree murder conviction under jury instructions that did not require agreement on whether the defendant was guilty of premeditated murder or felony murder is not unconstitutional].) Moreover, for the reasons discussed *post*, we reject Beverson's argument that the alleged error in introducing the expert's testimony without a limiting instruction violated his rights here.

probability of a more favorable result because the CSAAS testimony was presented in general terms, it was clear that the expert had no contact with the victim or knowledge of the underlying facts, and under such circumstances the jury would not have misunderstood or misapplied the expert testimony as proof that the victim was in fact sexually abused. (*Housley*, *supra*, 6 Cal.App.4th at p. 959.)

Similarly, in this case, it is not likely the jury was misled or confused by the expert testimony. The testimony was presented in general terms and based exclusively on the expert's experience in the field and knowledge of related literature. It was clear and undisputed the expert had no contact with the victims and no knowledge of the underlying facts: the expert testified she had not reviewed any discovery in Beverson's case, had not interviewed P. or M., and had no specific knowledge about the facts of this case. She emphasized she would testify only "generally about child sexual abuse," based on her personal experience dealing with victims of child sexual abuse and her knowledge from literature within the field. The expert never expressed an opinion as to whether P. or M. had been sexually abused or were being truthful, and the prosecutor never encouraged the jury to interpret the expert's testimony in this manner. In addition, the jury was instructed that it was not required to accept the expert's opinions as true or correct, that it had to determine the meaning and importance of any opinion, and that it could disregard any opinion that it found unbelievable, unreasonable, or unsupported by the evidence. The jury was further instructed it must decide the facts based on the evidence and judge the credibility of witnesses. Under the circumstances, even absent a limiting instruction, the jury would not have misunderstood or misapplied the expert

testimony as proof that the victims were in fact sexually abused. (*Housley*, *supra*, 6 Cal.App.4th at p. 959.)[17]

Despite Beverson's contention to the contrary, the expert's testimony was not improperly "geared to issues in the case." The expert stated she was not familiar with the victims or the facts in this case. All of her testimony, including her testimony regarding victims' delayed disclosure, the effect of a close relationship with the abuser on disclosure, and physical manifestations of sexual abuse, was made in general terms, regarding typical cases.[18] When asked whether bedwetting might occur as a physical manifestation of abuse, the expert remarked she had seen cases in which parents noted that behavior and indicated industry literature documented a connection. This does not indicate, as Beverson contends, that the expert's testimony was improperly

---

[17] Because the jury would not have used the expert's testimony in an impermissible manner, we reject Beverson's related argument that admission of the testimony without a limiting instruction had the effect of relieving the prosecution of its burden of proof. The expert testimony was introduced to respond to common misconceptions that jurors may have about the way child sexual abuse victims behave in response to traumatic events. The prosecution was still required to prove all elements of the crimes beyond a reasonable doubt.

[18] We thus reject Beverson's contention that the jury could have reasonably concluded the expert's testimony regarding delayed disclosure and bedwetting "constituted evidence [Beverson] committed the three crimes against [P.]" This contention lacks merit because it is based on a false premise we have rejected—that the jury misconstrued or misapplied the expert testimony as evidence the crimes occurred or as corroboration of the witnesses' testimony. Beverson further argues the alleged instructional error as to counts 1-3 affected the remaining counts—because the jury could have used the expert testimony to find Beverson guilty of counts 1-3, and then relied on CALCRIM No. 1191B to find Beverson guilty of the remaining counts. Because there was no error as to counts 1-3, however, Beverson's claim about the potential prejudicial effect on the remaining counts fails.

and "specifically geared to issues in the case." Rather, that the expert's testimony so aligned with the facts of the case only indicates that it was indeed relevant here " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1301), and that it was properly admitted here "to rehabilitate [a] witness's credibility" (*id*. at pp. 1300, 1302) and to "support another witness's credibility" (*Ward*, *supra*, 36 Cal.4th at p. 211).

Furthermore, the evidence against Beverson was overwhelming. The jury heard from two different, unrelated victims who provided detailed testimony regarding Beverson's repeated sexual abuse. The jury heard their emotional testimony and was able to assess their credibility. P. testified she was seven or eight years old when Beverson—her mother's boyfriend at the time—directed her to sit on the couch with him and rub her hand up and down his erect penis. He molested her when her mother was at work. P. testified that on at least two other occasions, Beverson called her into the bedroom that he shared with her mother and instructed her to play with his penis. P. further testified that she eventually broke down and told her uncle and grandmother about the sexual abuse, and her uncle, grandmother, and

mother corroborated her testimony regarding how upset she was when she disclosed the abuse to them.[19]

The jury also heard from M., who was abused by Beverson—her stepfather—for years beginning when she was nine or ten years old. M. testified they were lying on the couch together when Beverson began rubbing his hand on her vagina. This occurred when her mother was asleep in another room. Although M. attempted to discuss the abuse with her mother, her mother disregarded it, and it continued unabated for years. M. testified that Beverson's abuse progressed from the touching that first occurred on the couch to four types of sex acts which occurred at least once a week: digital penetration; oral copulation with his mouth on her vagina; oral copulation with her mouth on his penis; and sexual intercourse. M. testified Beverson had sexual intercourse with her over 50 times before she entered the eighth grade, 90 percent of their sexual encounters involved digital penetration, and 20 to 25 percent of their sexual encounters involved oral copulation. M. recounted how she would sometimes try to cross her legs or turn to avoid Beverson but he would use physical force to open her legs with his hands and proceed with the sex acts. M. testified that the abuse finally came to an end

---

[19]    Beverson argues that—in the absence of the expert's testimony—the jury "easily could have reasoned" that the charges as to P. were not proven beyond a reasonable doubt because "no criminal charges were filed" against him immediately after P.'s initial disclosures. We disagree. P.'s mother reported the alleged abuse to the police in 1998, but she testified that "nothing" happened as a result. P.'s uncle and grandmother testified that the police did not interview them until years later in 2016. It is not reasonably probable the jury would have reached a more favorable result based on this evidence of the police's limited investigation following the initial report in 1998.

when she was in tenth grade, but she continued to suffer from its effects and finally reported it in 2015.

M.'s childhood friend S.G. and S.G.'s mother corroborated M.'s story about becoming extremely upset during a sleepover at their house when M. read a story about a young girl who had been molested. S.G. recalled M. disclosing that M. had been molested too. S.G.'s mother testified that M. was traumatized that night.

M.'s testimony was further corroborated by C.R., who testified that M. had confided during their senior year in high school that Beverson had sexually abused M., and C.R.'s failure to keep M.'s secret cost her their friendship.

In sum, it is not likely the jury misunderstood or misapplied the expert testimony as proof the victims were in fact abused, and the other evidence against Beverson was overwhelming. We therefore conclude it is not reasonably probable the jurors used the CSAAS testimony in an objectionable manner or that Beverson would have achieved a more favorable result had a limiting instruction like CALCRIM No. 1193 been given.

Because Beverson cannot establish he was prejudiced by counsel's failure to request a limiting instruction, his ineffective assistance of counsel claim also fails. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; see *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [generally, for purposes of a claim of ineffective assistance of counsel, prejudice must be affirmatively proved].) Furthermore, Beverson cannot establish counsel's performance was deficient because the record sheds no light on why counsel did not request the limiting instruction—even when the prosecution raised the option of giving a limiting instruction to the jury. (*People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a

24

limiting instruction . . . outweighed the questionable benefits such instruction would provide."].)  Beverson claims that, because his counsel addressed the expert's testimony in his closing argument, he was not making a tactical decision in not requesting the limiting instruction.  But both decisions could be tactical strategies by counsel.  Counsel tried to discredit the expert's testimony by suggesting this was her first time testifying as an expert; she was not a psychologist, pediatrician, or scientist; she was merely discussing articles that she had read; her opinions were largely based on studies that were not valid; and it was "obvious that she [knew] a little bit more about the [specific facts of this] case than she let on," suggesting she was not being truthful.  Counsel could have rationally concluded the limiting instruction at issue was not necessary to support these attacks on the expert's testimony.  "As a tactical matter, competent counsel could rationally conclude that it would be counterproductive to request an instruction highlighting [CSAAS] expert testimony supporting the victim's credibility."  (*Mateo*, *supra*, 243 Cal.App.4th at p. 1076.)

## DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:



HUFFMAN, Acting P. J.



IRION, J.